**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

DENISE KAPPEL,

               *Movant,*

    v.

ADVANCED EQUITIES, INC.,

             *Respondent.*

No.:  08 CV 1991

JUDGE LEINENWEBER

MAGISTRATE JUDGE ASHMAN

## <u>RESPONDENT'S RESPONSE TO KAPPEL'S MOTION FOR SANCTIONS</u>

NOW COMES Respondent, Advanced Equities, Inc. ("AEI"), by its undersigned attorneys, Shefsky & Froelich Ltd., and respectfully submits this Response to Denise Kappel's ("Movant") motion for sanctions ("Motion") and addendum.

On May 6, 2008, AEI filed a Counterpetition asking this Court to modify the arbitration award in the FINRA arbitration captioned *Advanced Equities, Inc. v. Denise Kappel*, FINRA No. 06-01261 (the "Award").  Less than 24 hours later, Movant filed the motion for sanctions against AEI claiming that AEI's contentions "are disingenuous in so many aspects as to be truly shocking."  Motion, ¶ 1.  Apparently, the Movant did not take the time to review either the law or facts before filing the Motion.  Instead, Movant's hastily drafted Motion was brought against the wrong entity, citing case law involving the wrong statute and filled with material factual inaccuracies.  On May 13, 2008, Movant filed an addendum to her Motion ("Addendum"), which is similarly filled with factual inaccuracies and misrepresentations.

### I.    THE MOVANT NAMES THE WRONG ENTITY.

The Motion specifically requests this Court to impose sanctions against Respondent AEI pursuant to 28 U.S.C. § 1927.  *See* Motion, ¶¶ 1, 18.  As a threshold matter, a motion for sanctions under 28 U.S.C. § 1927 must be filed against the "*attorney or other person admitted to*

*conduct cases."* 28 U.S.C. § 1927.  Such a claim cannot be sustained against a party to the underlying action.  *Matta v. May*, 118 F.3d 410 (5th Cir. 1997); *U.S. v. Int'l. Bhd. of Teamsters, Chauffeurs, Warehousemen and Helpers of Am., AFL-CIO,* 948 F.2d 1338 (2d Cir. 1991); *F.T.C. v. Alaska Land Leasing, Inc.*, 799 F.2d 507 (9th Cir. 1986).  Because Movant incorrectly moves for sanctions against AEI, her Motion is procedurally improper and should be denied. *Id*.

In addition to being procedurally improper, the standards for a court to assess sanctions under § 1927 are not even close to being met.  *See, e.g.*, *TUF-Flex Glass v. National Labor Relations Board*, 715 F.2d 291, 298 (7th Cir. 1983) (Section 1927 award is described as an "extraordinary sanction" and was not warranted on the basis of factual misrepresentation).  A sanctioned party must have acted in bad faith, demonstrated by subjective evidence of malice, objective evidence of reckless conduct or indifference to the law.  *Kotsilieris v. Chalmers*, 966 F.2d 1181, 1184 (7th Cir. 1992); *In re TCI Ltd.*, 769 F.2d 441, 445 (7th Cir. 1985); *Burda v. M. Ecker Co.*, 2 F.3d 769 (7th Cir. 1993).  Indeed, the 7th Circuit noted in *TUF-Flex Glass* that even factual omissions by an attorney "do not warrant the award of fees, where, as here, the *legal* basis of the company's [motion] was, if not ultimately convincing, at least plausible."  *TUF-Flex Glass*, 715 F.2d at 298 (emphasis in the original).

## II.    AEI'S COUNTERPETITION IS WELL FOUNDED IN LAW AND FACT

AEI has a real and substantive legal basis for seeking modification of the arbitration award at issue in this case (the "Award").  As described in detail in AEI's counterpetition, the panel's calculation of the award: (1) grossly exceeds the statutory cap for damages under Title VII for a company AEI's size; and (2) fails to deduct the cost basis of the warrants awarded to Ms. Kappel, resulting in an evident material miscalculation.  AEI is not attempting to vacate the Award; it is merely challenging the calculation used in arriving at the amount of damages and requesting the Court modify the Award to comport with the actual findings of the panel.  Section

11 of the Federal Arbitration Act provides AEI the ability to move for modification of the Award due to evident material miscalculation. *See* 9 U.S.C. § 11. Regardless of Ms. Kappel's subjective consternation over the Counterpetition, there is real and substantial legal basis to challenge the calculation used to determine the Award and therefore the motion for sanctions must be denied.

In addition, the Motion is factually incorrect. First, Movant claims that AEI "purposefully ignores" testimony from Dwight Badger, and then identifies him as the CEO of AEI. Motion, ¶ 5. This is of great significance because Movant then goes on to cite testimony where Mr. Badger states "…I [*sic*] got an organization where I've got 400 – roughly . . . 300 plus employees." *Id.* Mr. Badger, however, is not the CEO of Respondent AEI and the Movant knows it. Contrary to Movant's allegation, Mr. Badger is the CEO of Advanced Equities Financial Corporation ("AEFC"), which is AEI's *parent company*. As Mr. Badger clearly testified, on page 135 of the same transcript Movant cites in her Motion:

> Q:    Would you be considered a supervisor of Ms. Kappel's?
>
> A:    Not a supervisor, no.
>
> Q:    Well, what are you?
>
> A:    I'm the CEO of Advanced Equities Financial Corp. I have about ten people that report to me, but I would clearly not be a supervisor. I'm not anywhere on the broker/dealer of Advanced Equities. …

Kappel Hearing Transcripts, attached hereto as Exhibit 1.

Importantly, AEI, not Advanced Equities Financial Corp. ("AEFC"), is the entity against whom a claim was brought under Title VII in the arbitration. AEFC *is not the entity* whose headcount is the operative number in determining damages against AEI. *See* Counterpetition,

Ex. A. By quoting Mr. Badger's testimony and misidentifying him to be the CEO of Respondent (*see* Motion, ¶ 3), Movant has engaged in a blatant attempt to mislead this Court.

In addition to incorrectly identifying Mr. Badger as the CEO of AEI, Movant misidentifies Mr. Daubenspeck as the Chairman of the Board of Respondent AEI. *See* Motion, ¶ 6. Mr. Daubenspeck is the Chairman of the Board of Directors of *AEFC*, not AEI. Again, this is a tactical move made by Movant to try and confuse this Court**.** As this exchange between Movant's counsel and Mr. Daubenspeck makes clear, Movant's counsel was well aware of Mr. Daubenspeck's position and which entity he was chairman of:

> Q:   And what is your position at Advanced Equities?
>
> A:   I'm the Executive Chairman. I run investment banking.
>
> Q:   How long have you had that position?
>
> A:   Well, the first 5 years of the company I was the Chairman CEO and so the last, I guess, I don't know what month of what year but I think '04, I started basically relegating my duties to investment banking and as I said I'm the executive chairman of the company.
>
> Q:   And what about, is there an Advanced Equities Financial Corp.?
>
> A:   That's correct. That's the company I'm Chairman of.

Kappel Hearing Transcripts, February 25, 2008, Tape 1, Side A.

Significantly, it was Movant's counsel's question regarding AEFC that clarified Mr. Daubenspeck's position as Chairman of the Board of Directors of AEFC, not AEI. Because Mr. Daubenspeck is not the Chairman AEI, when asked how many employees he had, Mr. Daubenspeck's answer was in reference to AEFC, not AEI. Respondent does not contest the

fact that AEFC, through its many subsidiaries, employs a great many more employees than AEI, however, this is not relevant to the damages awarded under Title VII. Movant did not sue AEFC, she sued AEI, a company that at all relevant times had less than 100 employees, and that has never in its history had between 200-300 employees. *See* Counterpetition, Ex. C.

Movant next claims that AEI "elected not to transcribe the arbitration tapes that contain testimony which support [*sic*] the award and then argues that no evidence exists in the selective record." Motion, ¶ 1. Again, Movant is mistaken. AEI had all the tapes in the custody of FINRA transcribed. The fact that no evidence exists to support the miscalculations in the Award is not due to any gamesmanship on behalf of AEI, it is because there is none. Movant's counsel is welcome to have all the tapes re-transcribed in order to establish that he is, in fact, incorrect and that absolutely nothing untoward on the part of AEI has occurred in this matter.[1]

Additionally, Movant claims that AEI "elected not to transcribe the portions of the closing argument where the undersigned attorney argued at length that, based on Badger and Daubenspeck's testimony, the undisputed evidence proved that Respondent had between 200 and 300 employees…." Motion, ¶ 7. As explained above, AEI requested all of the tapes from FINRA and had all the tapes supplied by FINRA transcribed on an expedited basis. Although Movant claims that testimony from both Mr. Badger and Mr. Daubenspeck prove that

---

[1]     Movant makes much of the Counterpetition's Ex. C, stating that it "impermissibly attempts to introduce evidence to this Court that was never presented to the Panel." Motion, ¶ 2. Exhibit C is the declaration of Rhonda Dixon, who declares AEI's headcount to be below 100 employees. *See* Counterpetition, Ex. C. Because Movant never presented evidence to the panel that showed AEI's headcount to be over 200 employees, AEI had no affirmative obligation in the arbitration to enter into evidence the number of people it employed. Indeed, AEI did not have the opportunity to dispute the "handout" Movant's counsel gave the panel during closing argument which incorrectly purported AEI's employees headcount to be between 200-300 people. *See* Counterpetition, Ex. B. Movant's counsel waited until after AEI had already closed before handing the panel the incorrect handout, thus giving AEI no chance to present testimony to the contrary.

Respondent had between 200 and 300 employees, this is simply not true.  In fact, with respect to the following testimony by Mr. Badger, his testimony is to the contrary:

> Q:      So how many people have there been at Advanced Equities from 1999 till today?  How many different brokers walked through the door and walked out the door?
>
> A:      Well, during the bubble, when we first started we ended up going up to about 40 brokers, and then because the NASDAQ and everything, you know, went to zero, people went and looked for jobs.  At the beginning of 2003, I think we had a total of six or seven brokers at the firm, including myself and Keith.  And so we were—believe it or not, the first quarter of 2003 our entire company had about 12 employees; and in 2002 we only did three million in revenue.
>
> Q:      How many—
>
> A:      So…
>
> Q:      --from then till [*sic*] now?  Simple question.
>
> A:      Well, it grew from like seven—seven brokers in 2000—the end—ending of 2002, beginning of 2003 it was about seven; and today I think we've crossed 70 brokers at Advanced Equities.

Kappel Hearing Transcripts, attached hereto as Exhibit 2.  This demonstrates that, contrary to Movant's claim, there is no "undisputed evidence prov[ing] that Respondent had between 200 and 300 employees…."  Motion, ¶ 7.

Inexplicably, Movant cites to legal authority dealing with the standards employed by courts for vacating an arbitration award and claims Respondent does not meet those standards.  *See* Motion, ¶¶ 2, 8.  For example, Movant attempts to take AEI to task for allegedly not meeting its burden, stating "Respondent first alleges there is insufficient evidence in the record…and not that the Panel purposefully ignored uncontradicted evidence or knowingly failed to apply the law."  Motion, ¶ 3.  Movant is confused.  While the standard cited is for *vacating* an award, AEI,

is petitioning for a *modification* of the Award.  The legal grounds for vacating an award as opposed to modifying an award are entirely different.  *Compare* 9 U.S.C. §10 and 9 U.S.C. §11.  Therefore, the legal standards for vacating an award and the cases interpreting those standards cited by Movant are wholly irrelevant.

Movant then advances the argument that it is a "complete mystery" how the panel came up with their damages, stating "the Panel did not indicate which of the Movant's damages theories set forth in her Amendment to the Statement of Claim [*sic*] it was adopting."  Motion, fn. 4; *see also id.,* ¶ 16 ("what warrants, if any, the Panel determined Movant earned and the price the Panel believed would make her whole as well as the amount of cash compensation, if any, is a complete mystery.")  Movant's argument that the panel's calculations are a "complete mystery" strains credulity.  Counsel provided the panel a handout that contained a thorough breakdown of Movant's request for damages, which stated in relevant part:

> INFINERA WARRANTS DIRECT INVESTMENT
> $5.40 STRIKE PRICE…
> 11,689 x $24 = **$260,328**
>
> Total Due Violation of Hostile Workplace Claim
> **$200,000** Based on Number of Employees
> Being between 200-300
> This Includes Punitive Damages for <u>This Particular Claim</u>

*See* Counterpetition, Ex. B (emphasis added).

The panel specifically broke out its Award addressing each distinct count, providing in relevant part:

> 2.  Claimant, Advanced Equities, Inc., is liable and shall pay to Respondent, Denise Kappel, the sum of **$260,328.00** in compensatory damages for breach of employment agreement;
>
> 3.  Claimant, Advanced Equities, Inc., is liable and shall pay to Respondent, Denise Kappel, the sum of **$200,000.00** in compensatory and punitive damages under Title VII....

*See* Counterpetition, Ex. A, p. 4 (emphasis added).

Movant's handout requested **$260,328** in damages for her breach of employment agreement claim (and provided the calculation to the panel), and the panel awarded her **$260,328** for her breach of employment agreement claim. Movant's handout requested **$200,000** in damages for her Title VII claim (and provided the calculation to the panel), and the panel awarded her **$200,000** for her Title VII claim. Finally, Movant submitted her fee petition for 40% of the award and was awarded exactly 40% of the Title VII award. *See* Counterpetition, Exs. A & D.

While Movant correctly states that "the law does not permit Respondent to speculate as to the Arbitration Panel's reasoning" (Motion, ¶ 11), she concedes that a motion to modify "comes into consideration when there is 'no mystery' as to the calculation and the court is not required to speculate." Motion, ¶ 12 (citing *Eljer Mfg., Inc. v. Kowin Development Corp.*, 14 F.3d 1250). The Court, however, is not required to leave all common sense at the courtroom door. This Court need not speculate in this matter; it need look no further than to Movant's handout. Indeed, there can be no mystery how the panel reached its Award.

Where there are errors that appear on the face of an exhibit used by a panel in formulating an award, the award must be modified to correct the flaws in the calculations. *See, e.g., Asturiana De Zinc Marketing, Inc. v. LaSalle Rolling Mills, Inc.*, 20 F. Supp. 2d 670, 673 (S.D.N.Y. 1998). In *Asturiana De Zinc Marketing, Inc.*, the court modified an arbitration award that used an exhibit containing incorrect amounts in its method of calculating damages, stating that "[s]ince the arbitrator's award otherwise matches the flawed amount to the dollar, it must be modified to … the amount yielded when these flaws are corrected." Similarly here, it is apparent that the panel adopted Movant's mathematically flawed demonstrative handout in formulating

the Award, as the Award "otherwise matches the flawed amount to the dollar." *Id.* Accordingly, this Court should modify the Award to "the amount yielded when these flaws are corrected." *Id.*[2]

Next, Movant discusses her theory regarding why the cost basis or strike price of the warrants should not be deducted from the Award. Motion, ¶¶ 14-16. Movant's argument, however, displays a fundamental lack of understanding as to how warrants operate. She states "[t]he fact that the warrants were exercisable at $5.40 payable from Movant's backend commissions is irrelevant to the determination of the value of the stock owned by Movant and hence her damages." Motion, ¶ 14. Movant wrongly explains that even if the market for these warrants was only $5.00 a warrant, "forty cents less than the exercise price…the warrants would still have considerable value to Movant", and that under Respondent's argument "Movant would get nothing because the market value was lower than the warrant price. Respondent would then pocket the $5 itself." Motion, fn. 6. Movant's argument defies logic. If the market value for the subject stock is less than the exercise price of the warrant, there is *no value at all* for Respondent to "pocket." The warrant would be worth negative 40 cents.[3]

Movant's flawed reasoning was specifically addressed within the hearing through the testimony of Mr. Badger. This testimony clearly illustrates Movant's lack of understanding as to how a warrant operates:

---

[2]    In an effort to distinguish the *Asturiana De Zinc Marketing, Inc.* case, Movant misrepresents the facts of that case to this Court. *See* Motion, fn. 5. Movant falsely claims that in *Asturiana*, the incorrect calculations were actually contained in the award, stating it "concerned an award with lengthy and detailed calculations of damages…." *Id.* This is completely false. *See id.*, attached hereto as Exhibit 3. The award in *Asturiana*, like here, adopted calculations submitted to the panel in an exhibit which contained "errors … apparent to the Court on the face of [Claimant] Asturiana's exhibit setting forth its method of calculating . . . charges." *Asturiana De Zinc Marketing, Inc.,* 20 F. Supp. 2d at 673. Importantly, these calculations *were not* included in the Asturiana award. *See id.* at 670.

[3]    Movant is confused. Movant's claim that the value of the warrant is different than the value of the underlying stock is simply not true. Where the stock price is $5.00 a share, and the exercise price of a warrant for that stock is $5.40, then each warrant would be worth  negative 40 cents.

Q:      So whether or not there is a profit, the person that has the direct investment would get those warrants if they were there.  If they're only worth three dollars, they're worth three dollars, correct, and that's what they get?  They get, let's say $12,003; right?

A:      No, that's not right.  They would get the warrants that are at – they strike at five dollars and 40 cents.

Q:      But if their market price is three dollars, they may have to report revenue at five dollars and forty cents.  But they still get that, and they could go out and sell them can't they, after January 1st?

A:      They can go out and sell the warrants even if they're under water?

Q:      No, not the warrants – you're getting the warrants, right?

A:      Who's getting them?  I'm – I'm sorry.  I'm just not…

Q:      Don't you get – you get stock – let's say it's five dollars and 40 cents.

A:      Right.

Q:      There is no profit.

A:      There is no profit, okay.

Q:      You'd still get the warrants?

A:      Well we get the warrants – you're saying the advisor?

Q:      They get the stock at $5.40.  They'd have 12,000 at $5.40.

A:      They'd have to exercise.

Q:      Yeah, they exercise.

A:      They'd have to exercise the warrants –

Q:      Right.

A:      -- for cash.

Q:    And there's no profit?

A:    Correct.

Q:    So this doesn't apply.   They can get it whether or not there's a profit, [*sic*] don't they?

A:    We wouldn't give it to them if there is not a profit.

Q:    Where is that written – where now is this second policy written that it's your policy now not to give it to them? Where would you find that?

A:    Could I tell you why, and I think you'll see…

Q:    No.  I want to know first where it's written.

A:    It's not written.

Q:    Okay.  Where is the broker told that?

A:    The broker is told that, because if we issued it to him, he would be – he would have a taxable event, and he would have to pay taxes on something that has no value.  And so we go to the broker and say, look, we're not going to issue you that warrant because it would have no value, and if you want to pay taxes on it, by all means we'll issue it to you. Okay.  But it's our policy that we wouldn't do that because it would put the broker in a bad position.

Kappel Hearing Transcripts, attached hereto as Exhibit 4.   Movant's obvious lack of understanding regarding warrants is significant for this Court to consider, as Respondent should hardly be sanctioned for properly requesting the exercise price of the warrants to be deducted from the Award.

Movant tries to argue that the panel need not deduct her cost basis from her warrants because the amount of $24 represented "back-end commissions."   Motion, ¶ 14.  This is pure fiction.  Movant only requested damages for *upfront* commissions and Infinera warrants, and did not request damages for back-end commission.   *See* Counterpetition, Ex. B.   Not only did

Movant not request back-end commissions at closing in her demonstrative exhibit which detailed all her purported damages, tellingly, she did not request them in her Amended Counterclaim. *See* Amendment to Counterclaim, ¶¶ 30-36, attached hereto as Exhibit 5.

Because back-end commissions were never an issue in this case, and Movant only requested front-end commissions and warrants, Movant's suggestion that the panel did not deduct the cost basis from the warrants because they meant to award her back-end commission is completely disingenuous.

WHEREFORE, Respondent Advanced Equities requests that the Court deny Movant's Motion for Sanctions and to correct the evident material miscalculations included in the Award.

DATED:  May 13, 2008                    Respectfully submitted,

                                        Advanced Equities Inc., *Respondent*


                                        BY:        s/ James D. Wilson
                                                   One of its attorneys

James D. Wilson (ARDC 3033643)
jwilson@shefskylaw.com
Sarah R. Farrell (ARDC 6282834)
sfarrell@shefskylaw.com
Attorneys for Respondent
SHEFSKY & FROELICH LTD.
111 East Wacker Drive, # 2800
Chicago, Illinois 60601
(312) 527-4000
1083513_1

# EXHIBIT 1

## Page 133

1    mean, I wouldn't want a gun to my head on it.
2        Q    All right.
3            What did she say to you?
4        A    She came in to my office and she said
5    there's a lot of rumors going around that I'm
6    sleeping with Jeff Fisher.
7            And I said, well, I haven't
8    heard any of those.  And she talked to me about
9    it.
10            The only other thing that I
11    remember from it is when she left she said, well,
12    if I was sleeping with somebody here, he'd have a
13    lot more money than Jeff Fisher.
14            And that was pretty much the
15    extent of the conversation.
16        Q    That's a complaint, right?  It's a
17    complaint about a rumor?
18        A    I didn't take it as a complaint.
19    She -- because she didn't seem like she was
20    complaining to me.
21            She said I want to come in
22    and -- you know, there's people saying that I've
23    slept with Jeff Fisher and I want you to know that
24    I haven't slept with him, and if I would sleep

## Page 134

1    with somebody here they'd a lot more money than
2    Jeff Fisher.
3        Q    There is...
4        A    I didn't take it as a complaint.
5        Q    Did you make a note of the
6    conversation?
7        A    I don't recollect if I did or not.
8        Q    Well, if you did, where would it be?
9        A    All I can say is I guess wouldn't
10    know.  So I -- it's probably...
11        Q    You wouldn't know where your own
12    notes would be if -- if you made a conversation?
13        A    It would be in a notebook that may
14    have gotten tossed out.  I..
15        Q    Now Denise files suit.  When does she
16    file suit?
17        A    I don't know.
18        MR. IAVARONE:  What's the date of the...
19        MR. BLOCK:  When did they file suit?
20        MR. IAVARONE:  No.  When did Denise file?
21        MR. BLOCK:  It says stamped received by the
22    ANFEC May 18th.
23        MR. IAVARONE:  Q Okay.  That's when the
24    counterclaim was filed.

## Page 135

1            So this counterclaim would have
2    been filed five months after you talked to Denise?
3        THE WITNESS:  A I...
4        Q    Right?
5            Did you go back and look for
6    your notes to see if you made any?
7        A    No, I -- obviously, I didn't.
8        Q    Have you ever gone back and looked?
9        A    No.  I -- no, I haven't.
10        Q    Has anybody asked you to go back and
11    look?
12        A    I can't recollect that anybody has
13    asked me to look.
14        Q    Would you be considered a supervisor
15    of Ms. Kappel's?
16        A    Not a supervisor, no.
17        Q    Well, what are you?
18        A    I'm the CEO of Advanced Equities
19    Financial Corp.
20            I have about ten people that
21    report to me, but I would clearly not be a
22    supervisor.  I'm not anywhere on the broker/dealer
23    of Advanced Equities.  As a president there, as an
24    officer manager, that would probably be her direct

## Page 136

1    boss.
2        Q    Let's say the president of the
3    company does something to me as an employee.
4    Would you or Mr. Daubenspeck be the person to go
5    to?
6        A    Um...
7        Q    If I were a woman and I wanted to
8    file a sexual harassment complaint made by the
9    president, would it be you or Mr. Daubenspeck that
10    I should go to?
11        A    Sure.
12        Q    Okay.
13            Isn't it true Denise asked you
14    to stop the rumors?
15        A    No.
16        Q    Did --
17        A    Absolutely not.
18        Q    -- You make any effort to determine
19    whether or not the rumors, in fact, were being
20    said?  Did you interview anyone?
21        A    I did ask Mr. Fisher if he had heard
22    anything or if anybody was talking about it.
23            Because that's what she said to
24    me.  She said I've heard some people think I'm

# EXHIBIT 2

Page 89

1      A   Six, four.
2         ARBITRATOR DAVIS:  I'm not sure of the
3   relevance of all this.  I think you've made your
4   point.
5         MR. IAVARONE:  Q Mr. Galinski, does he
6   handle an account personally for your partner?
7         MR. AMATO:  Relevance.
8         MR. IAVARONE:  Because I'm going to show
9   why --
10        ARBITRATOR DAVIS:  Overruled.
11        MR. IAVARONE:  -- He's the only one.  Does
12   he --
13        ARBITRATOR DAVIS:  All right.
14        MR. IAVARONE:  Q Does he handle an account
15   for your partner?
16        THE WITNESS:  A I don't know -- not his
17   personal account.
18     Q   Any account.
19     A   I don't know.  He...
20     Q   Okay.
21     A   I don't know.
22     Q   So how many people have there been at
23   Advanced Equities from 1999 till today?  How many
24   different brokers walked through the door and

Page 90

1   walked out of the door?
2      A   Well, during the bubble, when we
3   first started we ended up going up to about 40
4   brokers, and then because the NASDAQ and
5   everything, you know, went to zero, people went
6   and looked for jobs.
7         At the beginning of 2003, I
8   think we had a total of six or seven brokers at
9   the firm, including myself and Keith.  And so we
10   were -- believe it or not, the first quarter of
11   2003 our entire company had about 12 employees;
12   and in 2002 we only did three million in revenue.
13     Q   How many --
14     A   So...
15     Q   -- From then till now?  Simple
16   question.
17     A   Well, it grew from like seven --
18   seven brokers in 2000 -- the end -- ending of
19   2002, beginning of 2003 it was about seven; and
20   today I think we've crossed 70 brokers at Advanced
21   Equities.
22     Q   What private equity deal did Mr.
23   Galinski get his warrants in?
24     A   Arbinet.

Page 91

1      Q   What did he get?  Warrants or money?
2      A   He got money.
3      Q   Was he the only person that had sold
4   Arbinet that was still at Advanced Equities?
5      A   Yes.
6      Q   Mr. Camphausen had not sold any?
7      A   Mr. Camphausen had not sold any that
8   we had warrants -- that we received warrants on.
9         There was a second piece they
10   did that was a tack on two years after we did the
11   round that Mr. Camphausen sold, but we weren't
12   compensated for warrants on that piece.
13         So the only person that was
14   there that sold Arbinet when we were doing the
15   round where we received warrant compensation was
16   Mr. Galinski.
17     Q   So my understanding -- just so I'm
18   clear -- Advanced Equities is sent 35 to 40 deals.
19   It's been in business for about eight years.
20   Whether you're doing direct or whether you're
21   doing it through an LLC, there would be
22   possibility for a back end; right?
23     A   Right.
24     Q   And the only time that anybody has

Page 92

1   gotten any back end is this one man, Mr. Galinski,
2   correct?
3      A   We only had two deals that had gone
4   public since the bubble.  And so the only other
5   one where you could possibly receive warrants
6   would be Infanara -- or back ends.
7         And that -- we can't pay those
8   out until the end of December.
9         So to answer your question,
10   yes, that's true, but there's -- it's not like
11   there's a whole bunch of other people that are
12   there -- or that would have been owed it.
13     Q   How many people did you say raised
14   money for Infanara?  How many different brokers?
15         So that would be -- that's
16   something you'd have a record of, right?
17     A   Sure, yeah.
18     Q   Would you have a record for the --
19   let me ask you this.  Did you have a record of --
20   that would show who raised --
21     A   Absolutely.
22     Q   -- And whether they raised it direct
23   or indirect for Infanara?
24     A   Absolutely.

# EXHIBIT 3

Westlaw.

20 F.Supp.2d 670
20 F.Supp.2d 670
**(Cite as: 20 F.Supp.2d 670)**

Page 1

▷
Asturiana De Zinc Marketing, Inc.v. LaSalle
Rolling Mills, Inc.
S.D.N.Y.,1998.

United States District Court, S.D. New York.
ASTURIANA DE ZINC MARKETING, INC., f/k/a
Austmet, Inc., Petitioner,
v.
LASALLE ROLLING MILLS, INC., Respondent.
**No. 97 CIV. 6053 (JSR).**

Sept. 29, 1998.

Seller of trade metals petitioned to confirm arbitra-
tion award for unpaid deliveries, and buyer sought
to vacate or modify award. The District Court,
Rakoff, J., held that: (1) arbitrator's acceptance of
seller's new calculations of principal and interest
owed, submitted posthearing, was not fundament-
ally unfair or prejudicial to buyer; (2) miscalcula-
tion of charges incurred for storage and carrying
warranted downward modification of award; and
(3) award of attorney fees was made in manifest
disregard of New York substantive law.

Award reduced accordingly.

West Headnotes

**[1] T ⌘265**

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(F) Arbitration Proceedings
            25Tk264 Reception of Evidence
                25Tk265 k. In General. Most Cited
Cases
    (Formerly 33k32 Arbitration)
Arbitrator's acceptance of seller's new calculations
of principal and interest owed by buyer, submitted
posthearing, thus denying buyer opportunity to
cross-examine or present new evidence, was not
fundamentally unfair or prejudicial to buyer, since
new calculations were not based on new evidence,

but on old evidence simply subjected to new math-
ematical calculation, and evidence buyer claimed it
would have submitted in response to new calcula-
tions was largely already before arbitrator at hear-
ing. 9 U.S.C.A. § 10(a)(3).

**[2] T ⌘325**

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(G) Award
            25Tk325 k. Amount of Award, or Over-
valuation and Undervaluation. Most Cited Cases
    (Formerly 33k32 Arbitration)
Seller could not avoid reduction of its arbitration
award, for acknowledged error in including charges
for shipment of metal that was not part of arbitra-
tion, by submitting posthearing evidence, in which
it recalculated shipping charges to account for er-
ror, since seller's posthearing calculations applied
new mathematical formula to combination of both
old and new evidence, including charges on ship-
ments that were never mentioned in its initial re-
quest, and thus, buyer never had opportunity to
challenge new evidence. 9 U.S.C.A. § 11(a, b).

**[3] Costs 102 ⌘194.16**

102 Costs
    102VIII Attorney Fees
        102k194.16 k. American Rule; Necessity of
Contractual or Statutory Authorization or Grounds
in Equity. Most Cited Cases
New York law follows "American Rule," which
permits award of attorney fees in action only where
specifically provided for by statute or contract.

**[4] T ⌘269**

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(F) Arbitration Proceedings
            25Tk269 k. Costs. Most Cited Cases
    (Formerly 33k42 Arbitration)
Even assuming arbitrator, acting pursuant to arbit-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ration clause in contract between buyer and seller that subjected any disputes to substantive laws of New York, had power to award attorney fees, award to seller was in manifest disregard of New York law, absent substantive agreement between parties, or statutory basis for award. Employee Retirement Income Security Act of 1974, § 4221(a)(2), as amended, 29 U.S.C.A. § 1401(a)(2); N.Y.McKinney's CPLR 7513.

**\*671** Kevin Conway, New York City, for Petition- er. Paula Jacobi, Patrick Rohan, New York City, for Respondent.

### MEMORANDUM ORDER

RAKOFF, District Judge.
In law, as in medicine, there are many nostrums but no panaceas. Ironically, the vaunted informality of arbitration may invite the arbitrator to be arbitrary- for who will ever know the difference? Still, businesses know what they are getting when they agree to arbitrate and cannot be heard to complain unless the results plainly manifest disregard of law and reason. In the instant case, two components of an arbitration award fail to survive even this modest scrutiny, but the rest pass muster.

The issue comes before this Court upon the petition of Asturiana De Zinc Marketing, Inc. ("Asturiana"), which sells and trades metals, to confirm an arbitration award of $359,534.62 against LaSalle Rolling Mills, Inc. ("LaSalle"), which manufactures metal products. LaSalle, in turn, seeks to vacate or modify the award.

The dispute that was the subject of the arbitration concerns LaSalle's alleged failure to promptly pay Asturiana for several deliveries of zinc. Under each contract, LaSalle was obligated to make payment to Asturiana thirty days after delivery, and interest on late payments was assessed at the published prime rate plus 2%. Each of these contracts also contained the following arbitration clause:

Any dispute relating to or arising out of this sale shall be submitted to arbitration before the American Arbitration Association in New York City and shall be subject to the substantive laws of New York State without reference to conflict of law principles.

Over the course of several years, LaSalle repeatedly failed to make full payments on time, but made periodic partial payments. When the parties were unable to resolve how much was still due, the matter was referred to a duly appointed arbitrator of the American Arbitration Association ("AAA"), who conducted an evidentiary hearing on June 18, 1997. No contemporaneous record was made of the hearing, and the parties have submitted varying sworn accounts of what occurred and of what arrangements were made for post-hearing submissions. It is undisputed, however, that Asturiana's post-hearing submission recalculated the amount of principal and interest previously demanded and requested an award of $223,262.92 principal and $15,747.70 interest, an increase of more than $30,000 over the amount Asturiana had requested at the hearing. Asturiana's post-hearing submission also altered its method of calculating contango charges [FN1] and thereby **\*672** slightly increased its claim for such charges from $55,524.00 to $56,904.40. In response to these recalculations, LaSalle sent a letter to the arbitrator on July 3, 1997, objecting to any consideration of Asturiana's post-hearing submission on the ground that all evidence should have been submitted at the hearing and that LaSalle was denied the opportunity to cross-examine anyone about Asturiana's increased claims.

> FN1. "Contango" charges, standard in metal futures markets, take into account storage and carrying charges incurred by sellers in periods of glut. Apparently the zinc market was "in a contango" during the periods in question.

The Arbitration Award issued on August 6, 1997. The arbitrator accepted Asturiana's recalculated claims for principal and interest, awarding

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

$223,262.92 for "product delivered and unpaid" and $15,747.70 for "interest on amount due for the periods ending June 30, 1997." However, the arbitrator rejected the recalculation of the contango charges and awarded the originally-requested $55,524.00 for such charges. Finally, the arbitrator awarded Asturiana $65,000.00 in attorneys' fees, resulting in a total award of $359,534.62.[FN2] This action followed.

> FN2. The arbitrator also provided that "interest shall continue to run on the unpaid [principal] amount of $223,262.92 from June 30, 1997 to the date this amount is paid in full, or until the Award is entered as a judgment in a court of competent jurisdiction," and that "[i]nterest on the [contango] amount of $55,524.00 shall run from October 1, 1994" to the date the amount is paid in full or judgment entered-with all such interest to be computed at the prime rate reported in the Wall Street Journal plus 2% and with partial payments to be applied first to interest and then to principal. Finally, the arbitrator ordered LaSalle to bear various costs relating to the compensation of the arbitrator and the administrative fees and expenses of the AAA.

Under the Federal Arbitration Act, 9 U.S.C. §§ 1-16, the Court's "function in confirming or vacating an arbitration award is severely limited" so that the "ostensible purpose for resort to arbitration, i.e., avoidance of litigation, [is not] frustrated." *Synergy Gas Co. v. Sasso,* 853 F.2d 59, 63 (2d Cir.1988) (citation and internal quotation marks omitted). However, there are several statutory and judge-made grounds for vacating or modifying an arbitration award, and LaSalle invokes many of them, claiming that the arbitrator "exceeded [his] powers," 9 U.S.C. § 10(a)(4), was guilty of "manifest disregard of the law," *Halligan v. Piper Jaffray, Inc.,* 148 F.3d 197, 1998 WL 385539 (2d Cir.1998), made an "evident material miscalcula-

tion of figures" and "awarded upon a matter not submitted to him,"9 U.S.C. § 11(a)-(b), and "refus[ed] to hear evidence pertinent and material to the controversy" or engaged in "other misbehavior by which [respondent's] rights ... have been prejudiced,"*id.*§ 10(a)(3). LaSalle's contentions will be considered separately with respect to (a) principal and interest, (b) contango charges, and (c) attorneys' fees.

*Principal and Interest.* LaSalle's argument for modifying or vacating the arbitrator's award of principal and interest centers on his acceptance of Asturiana's new calculations after the hearing, when LaSalle lacked an opportunity to cross-examine or to present new evidence. According to LaSalle, in permitting this irregular procedure the arbitrator exceeded his powers and violated Rule 31 of the AAA's Commercial Arbitration Rules, which requires that "all evidence shall be taken in the presence of all of the arbitrators and all of the parties."

However, AAA Rule 32 permits the arbitrator to direct "that documents or other evidence be submitted to the arbitrator after the hearing" as long as "[a]ll parties [are] afforded an opportunity to examine such documents or other evidence." Additionally, under AAA Rule 36, a hearing may be reopened at the arbitrator's initiative.

Therefore, the real question is not whether the arbitrator violated his own organization's rules of fair play but rather whether he violated fundamental rules of due process. "[A]lthough not required to hear all the evidence proffered by a party, an arbitrator must give each of the parties to the dispute an adequate opportunity to present its evidence and argument. Federal courts do not superintend arbitration proceedings. Our review is restricted to determining whether the procedure was fundamentally unfair." *Tempo Shain Corp. v. Bertek, Inc.,* 120 F.3d 16, 20 (2d Cir.1997); *see also Konkar Maritime Enterprises, S.A. v. Compagnie Belge D'Affretement,* 668 F.Supp. 267, 271 (S.D.N.Y.1987) ("All parties in an arbitration pro-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ceeding are entitled to notice and an opportunity*673 to be heard."(citation and internal quotation marks omitted)).

[1] Regardless of which party's view of what the arbitrator ordered to be submitted after the hearing is the correct one, the Court does not discern any fundamental unfairness or "misbehavior by which the rights of [the respondent] have been prejudiced,"9 U.S.C. § 10(a)(3), in the procedure followed here with respect to the award of principal and interest. The new amounts of principal and interest proposed by Asturiana after the hearing were not based on new evidence: they were old evidence simply subjected to a new mathematical calculation, a calculation that the arbitrator presumably could have performed on his own. Further, the evidence of a contrary prior custom of the parties in calculating such charges that LaSalle claims it would have submitted in response to the new calculations was largely already before the arbitrator at the hearing. Accordingly, there is no basis for vacatur or modification on this ground.FN3

> FN3. LaSalle also claims that the arbitrator showed "manifest disregard of the law" by not giving force to an alleged executory accord between the parties that allowed LaSalle to pay its debts at a rate of $4,000 a month. This argument fails, because although LaSalle attempts to prove that executory accords are valid and must be materially breached before a party's pre-settlement claims may be sued upon, *see* Defendant's Memorandum of Law at 19-20, there is no question that an arbitrator applying the legal principles that LaSalle urges could, as a factual and evidentiary matter, have declined to find that the alleged accord created the kind of agreement that LaSalle suggests it did. *See* Jacobi Dec. Exh. 7; *see generally Halligan,* 148 F.3d 197, 201 (defining "manifest disregard").

*Contango Charges.* Even though the arbitrator did not accept Asturiana's post-hearing recalculation of the contango charges, the amount of contango charges awarded must be modified downward on the basis of an "evident material miscalculation of figures" and an award on a "matter not submitted" to the arbitrator. 9 U.S.C. § 11(a)-(b). At the hearing, Asturiana claimed that LaSalle owed $55,524.00. In response, LaSalle pointed out some mathematical errors in Asturiana's calculations and called the arbitrator's attention to the fact that $1,890.00 of the amount requested was based on a shipment under a contract that was not part of the arbitration, a point that was explicitly conceded by Asturiana in its post-hearing submission. These errors are also apparent to the Court on the face of Asturiana's exhibit setting forth its method of calculating contango charges.

Since the arbitrator's award otherwise matches the flawed amount to the dollar, it must be modified to $51,604.00, the amount yielded when these flaws are corrected.

[2] Asturiana cannot avoid this result through reliance on its post-hearing submission, in which it argued that the obvious mathematical errors were actually the result of "a simplified system in the effort of fairness to encompass the costs of Asturiana while minimizing the burden on LaSalle" and that a more fine-tuned approach would actually entitle it to contango charges of $56,904.40. Jacobi Dec. Exh. 5. First, the arbitrator did not adopt the new amount that Asturiana suggested. Second, even were there some remotely plausible possibility that the arbitrator considered the new contango calculations but capped his award at the amount previously requested, such a methodology would endanger respondent's right to fundamental procedural fairness. Unlike Asturiana's post-hearing calculation of principal and interest, which merely subjected old evidence to a new mathematical formula, Asturiana's post-hearing contango calculations applied a new mathematical formula to a combination of both old and new evidence, including contango charges on shipments that were never mentioned in its initial

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

20 F.Supp.2d 670
20 F.Supp.2d 670
**(Cite as: 20 F.Supp.2d 670)**

contango request-and that respondent thus never had an opportunity to challenge.

*Attorneys' Fees.* The focus of LaSalle's objections to the arbitrator's award of $65,000 in attorneys' fees does not relate to the calculation of the amount but rather to whether the arbitrator's awarding any attorneys' fees constituted "manifest disregard" for substantive New York law. This in turn raises two issues.

**\*674** The first is whether an arbitrator, acting pursuant to a contractual agreement that contains the above-quoted arbitration clause invoking New York law, has the power to award attorneys' fees at all, since a New York arbitrator would normally be precluded from awarding such fees. *See* N.Y. C.P.L.R. § 7513 (stating that attorneys' fees shall not be awarded in arbitration unless provided for in the agreement to arbitrate). Although the matter is hardly free from doubt, the Court does not reach this issue but instead assumes *arguendo,* for purposes of this decision, that the arbitrator had such power in this case. *See PaineWebber Inc. v. Bybyk,* 81 F.3d 1193, 1202 (2d Cir.1996) ("[A] choice of law provision will not be construed to impose substantive restrictions on the ... right to arbitrate claims for attorneys' fees."); *see generally Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995).FN4

> FN4. The Court notes, however, that *Mastrobuono,* on which *PaineWebber* was based, dealt with punitive damages rather than attorneys' fees. Arguably, the equitable consideration behind the *Mastrobuono* decision-that interpreting a New York choice of law provision to incorporate a New York rule forbidding awards of punitive damages by arbitrators would in effect force petitioners to give up an "important substantive right" based on a rule that they were probably unaware of, *Mastrobuono,* 115 S.Ct. at 1219-is not applicable in the attorneys' fees context, where the normal

expectation under the "American Rule" is that fees will not be awarded. *See PaineWebber, Inc. v. Richardson,* 1995 WL 236722, at *4 (S.D.N.Y.1995); *Sammi Line Co., Ltd. v. Altamar Navegacion S.A .,* 605 F.Supp. 72, 74 (S.D.N.Y.1985). It is also arguable that the above-quoted integrated arbitration and choice-of-law provision in this case creates less ambiguity about the parties' intent to apply New York arbitration law than the separate provisions that were at issue in *Mastrobuono, see Mastrobuono,* 115 S.Ct. at 1216-17 & n. 2; *cf. Insurance Co. of North America v. ABB Power Generation, Inc.,* 925 F.Supp. 1053, 1058 (S.D.N.Y.1996), especially if the provision is construed against the drafter, here petitioner, *see PaineWebber,* 81 F.3d at 1199.

However, even if the above-quoted clause does not, by operation of New York law, deprive the arbitrator of the power of determining whether to award attorneys' fees, that determination, both sides here agree, must still be made in accordance with the principles of New York substantive law regarding when such an award is warranted. In other words, the AAA arbitrator here is assumed to have the same power as a New York Court (as opposed to a New York arbitrator) to award attorneys' fees, but must still make that determination in accordance with the substantive law such a court would apply. *See generally Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 628, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985) ("By agreeing to arbitrate a statutory claim, a party does not forego the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum."). Indeed, both *PaineWebber* and *Mastrobuono* specifically acknowledge that, while the federal presumption in favor of arbitrability (along with certain other factors) trumps the application of New York's "special rules limiting the authority of the arbitrators" when the New York choice-of-law agreement does not specifically

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

provide for the application of such special rules, the choice-of-law provision nevertheless "encompass[es] substantive principles that New York courts would apply." *Mastrobuono*, 115 S.Ct. at 1219; *see also PaineWebber*, 81 F.3d at 1200.

[3] In regard to these substantive principles, New York follows the prevailing "American Rule" on fee-shifting, permitting an award of fees only where "specifically provided for by statute or contract." *Marotta v. Blau*, 241 A.D.2d 664, 659 N.Y.S.2d 586, 586 (3d Dep't 1997); *see Orlowski v. Koroleski*, 234 A.D.2d 436, 651 N.Y.S.2d 137, 137 (2d Dep't 1996) (stating that generally attorneys' fees may not be awarded "unless an award is authorized by express agreement between the parties, by statute, or by court rule"); *Bank of New York v. Fleet Bank, N.A.*, 176 Misc.2d 21, 671 N.Y.S.2d 945, 948 (Sup.Ct.N.Y.Cty.1998) (stating that "the court should not infer a party's intention to waive the benefit of the [fee] rule unless the intention to do so is unmistakenly [sic] clear from the language of the promise" (internal quotation marks omitted)); *see also Grand Union Co. v. Cord Meyer Development Co.*, 761 F.2d 141, 147 (2d Cir.1985)(stating that New York state law "requires, in the absence of an *675 agreement among the parties, statutory authorization for such an award").

[4] Here, there clearly is no agreement among the parties that attorneys' fees may be awarded. The *jurisdictional* agreement to submit "[a]ny dispute" to arbitration is clearly not equivalent to a *substantive* agreement that states that attorneys' fees may be awarded to the prevailing party or something along those lines. The reference in the parties' agreement to arbitration before the AAA is also not a sufficient contractual basis for an award of fees, because although AAA Rule 43 allows arbitrators to grant "any remedy or relief that the arbitrator deems just and equitable *and* within the scope of agreement of the parties" (emphasis added), this Rule merely "refers back to the parties' contract and limits the scope of the arbitrator['s] authority to the contract's express terms." *In Matter of Prudential-Bache Se-*

*curities, Inc., Depew*, 814 F.Supp. 1081, 1083 (M.D.Fla.1993).[FN5]

> FN5. *But cf. Silvester Tafuro Design, Inc. v. Sachs*, 1996 WL 257668, at *4 (S.D.N.Y.1996) (stating, while also relying on several other grounds for upholding an arbitrator's award of attorneys' fees, that inclusion of AAA Rule 43 in a contract constitutes "an agreement to submit all claims encompassed by this provision to arbitration").

Nor is there a statutory basis for an award of fees. Unlike certain federal statutes, *see, e.g.,*29 U.S.C. § 1401(a)(2), the FAA does not provide an independent source of authority for an award of attorneys' fees. *See Brotman v. Sant Cassia Investment Management*, 1997 WL 401671, at *4 (S.D.N.Y.1997). Additionally, Asturiana has not pointed this Court to any New York statute applicable to the instant case, and the Court's research has revealed none.

Finally, the arbitrator gave no explanation for the award of attorneys' fees and Asturiana has offered none that remotely squares with New York law. The Court finds, therefore, that the arbitrator's award of attorneys' fees to Asturiana was in "manifest disregard" of New York substantive law, which in this regard was "well defined, explicit, and clearly applicable to the case." *Halligan*, 148 F.3d 197, 201; *see also id.* at 202 (suggesting that "when a reviewing court is inclined to hold that an arbitration panel manifestly disregarded the law, the failure of the arbitrator[ ] to explain the award can be taken into account"); *cf. DeGaetano v. Smith Barney, Inc.*, 983 F.Supp. 459, 463-64 (S.D.N.Y.1997) (finding manifest disregard where arbitrator incorrectly applied substantive Title VII rule on attorneys' fees).[FN6]

> FN6. *DiRussa v. Dean Witter Reynolds, Inc.*, 121 F.3d 818 (2d Cir.1997), in which the Second Circuit refused to find an arbitrator's failure to award attorneys' fees under the mandatory provisions of the ADEA

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to be manifest disregard of the law-the converse of the case at hand-is distinguishable, because it hinged on the Court's determination, after a review of a transcript of the proceedings, that the arbitrator was not aware of the applicable law. *See id.* at 822-23. Here, the arbitrator was himself an attorney.

The Court has considered the parties' other arguments and finds them without merit. Accordingly, for the foregoing reasons, the arbitrator's award is hereby reduced to an amount of $290,621.62, and as such is confirmed with interest to be calculated and partial payments to be applied in the manner previously specified by the arbitrator. Clerk to enter judgment.

SO ORDERED.

S.D.N.Y.,1998.
Asturiana De Zinc Marketing, Inc. v. LaSalle Rolling Mills, Inc.
20 F.Supp.2d 670

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 4

Page 189

1    A   That's right.
2    Q   Well, since there are four different
3  ones, explain to me which LLC would be applicable
4  to Ms. Kappel. How would you know reading
5  employment at will?
6        If there's multiple LLCs and I
7  make a direct investment, how do I read this
8  employment at will?
9    A   How it relates to her...
10    Q   No, anybody. Let's say I'm there.
11  I've sold the direct investment.
12    A   Okay. So if you sold a direct
13  investment, you would not have to deal with the
14  LLCs.
15    Q   Right.
16    A   They're not an LLC.
17    Q   And so this paragraph would not apply
18  to somebody that has a direct investment broker,
19  because it deals with LLCs; correct?
20    A   But it -- well, it does. It does.
21        Because it says with or without
22  cause you will forfeit any right you may have
23  otherwise had to participate in the profits from
24  any warrants.

Page 190

1        And that's what you get if you
2  make a direct investment. You get warrants, not
3  back ends, from an LLC.
4        So that does apply to
5  Ms. Kappel because it says you will forfeit any
6  warrants, options, securities and/or carried
7  interest related to private placement of
8  securities where there has not been a transfer to
9  LLC memberships in calendar year...
10    Q   What LLC members? If there's
11  multiple ones, which one do I know -- I'm sitting
12  there. I sold X. There's four LLCs.
13    A   Well, if you don't know which one
14  your customer went in to...
15    Q   No. My customer is a direct
16  investor.
17    A   Then they're not in an LLC.
18    Q   That's my point. They're not in an
19  LLC. They wouldn't know. And this could not
20  apply to them, especially when there's multiple
21  LLCs because...
22    A   Well it says -- it says warrants.
23  You -- you for -- so if you're not -- if you're
24  not in an LLC, the part that is applicable to

Page 191

1  you -- it says upon your termination through the
2  dates of any year for whatever reason, whether
3  voluntary, involuntary, with or without cause you
4  will forfeit any right you have otherwise had to
5  participate in the profits of any warrants -- she
6  has a right to...
7    Q   You don't get profits. That's for
8  the LLC. She gets the warrants.
9    A   The profits are..
10    Q   Let me stop.
11        On a direct investment, even if
12  it isn't making money, she'd still get the
13  warrants. They may be worth only three dollars a
14  share. There would be no profit, but she'd still
15  get those warrants?
16    A   No, she wouldn't.
17    Q   On a direct investment --
18    A   On a direct...
19    Q   -- She wouldn't get them?
20    A   No.
21    Q   Why not?
22    A   Because we're under an obligation
23  from the company not to issue them warrants. We
24  can't break those up. That's in our placement

Page 192

1  agent agreements.
2        And if we become an issuer of
3  the warrants...
4    Q   Do you have the placement agent
5  agreement for Infanara?
6    A   Sure, we do.
7    Q   Could we get that tomorrow morning?
8    A   Sure, you can.
9    Q   Okay.
10    A   Okay. And if we issue warrants, we
11  blow our reg D exemption.
12        That's an NASD rule. I don't
13  make those rules.
14        So we can't give Ms. Kappel,
15  even today, warrants without being in violation of
16  that.
17    Q   But you can give her warrants as of
18  January 1st of next year?
19    A   And we would --
20    Q   All right.
21    A   -- If she was employed at the firm.
22    Q   So whether or not there is a profit,
23  the person that has the direct investment would
24  get those warrants if they were there. If they're

Page 193

1  only worth three dollars, they're worth three
2  dollars, correct, and that's what they get?  They
3  get, let's say, $12,003; right?
4      A  No, that's not right.  They would get
5  the warrants that are -- they strike at five
6  dollars and 40 cents.
7      Q  But if their market price is three
8  dollars, they may have to report revenue at five
9  dollars and 40 cents.  But they still get that,
10  and they could go out and they could sell them,
11  can't they, after January 1st?
12      A  They can go out and sell the warrants
13  even if they're under water?
14      Q  No, not the warrants -- you're
15  getting warrants, right?
16      A  Who's getting them?  I'm -- I'm
17  sorry.  I'm just not...
18      Q  Don't you get -- you get stock --
19  let's say it's five dollars and 40 cents.
20      A  Right.
21      Q  There is no profit.
22      A  There is no profit, okay.
23      Q  You'd still get the warrants?
24      A  Well we get the warrants -- you're

Page 194

1  saying the adviser?
2      Q  They get the stock at five, forty.
3  They'd have 12,000 and five, forty.
4      A  They'd have to exercise.
5      Q  Yeah, they exercise.
6      A  They'd have to exercise the
7  warrants --
8      Q  Right.
9      A  -- For cash.
10      Q  And there's no profit?
11      A  Correct.
12      Q  So this doesn't apply.  They can get
13  it whether or not there's a profit, don't they?
14      A  We wouldn't give it to them.  It's
15  not our policy to give it to them if there is not
16  a profit.
17      Q  Where is that written -- where now is
18  this second policy written that it's your policy
19  now not to give it to them?  Where would you find
20  that?
21      A  Could I tell you why, and I think
22  you'll see...
23      Q  No.  I want to know first where it's
24  written.

Page 195

1      A  It's not written.
2      Q  Okay.
3          Where is the broker told that?
4      A  The broker is told that, because if
5  we issued it to him, he would be -- he would have
6  a taxable event, and he would have to pay taxes on
7  something that has no value.
8          And so we go to the broker and
9  say, look, we're not going to issue you that
10  warrant because it would have value, and if you
11  want to pay taxes on it, by all means we'll issue
12  it to you.
13          Okay.  But it's our policy that
14  we wouldn't do that because it would put a broker
15  in a bad position.
16      Q  Let me ask you This.  Four LLCs.  If
17  I'm on a direct investment, as long as one LLC has
18  made a transfer, I'm entitled to my warrants,
19  right, if I made a direct, according to this?
20      A  If you're at the firm and in good
21  standing, yes.
22      Q  All right.
23          So this refers to -- not the
24  LLC, are you saying, of the broker, but to any LLC

Page 196

1  that would have the warrants in them?
2      A  The LLCs don't have warrants in them.
3  The LCCs have no warrants.
4      Q  Or anything, any distribution to the
5  LLC would then qualify the broker with the direct?
6      A  If there's a distribution made to the
7  customer of cash back, okay.
8      Q  In any LLC.
9      A  In any -- for Infanara.  Only -- not
10  any LLC, but pertinent to Infanara.
11      Q  Well, where does it say it has to be
12  to that particular placement?
13      A  Well, how can I pay somebody Infanara
14  warrants if some other LLC has a liquidity event
15  that did I.P. Unity?
16          I'm I'm not going to -- you
17  know, that would be pertinent to the I.P. Unity
18  guys, not the Infanara guys.
19          So you have to -- if it's -- if
20  we're specifically talking about Infanara, it
21  would have to be on the deal that they would be
22  owed warrants on.
23      Q  Well I'm just trying to see where --
24  what I'm trying to see -- because you drafted

# EXHIBIT 5

**IN ARBITRATION BEFORE THE**
**FINANCIAL INDUSTRY REGULATORY AUTHORITY**

| | | |
|---|---|---|
| **ADVANCED EQUITIES, INC.,** | ) | |
| | ) | |
| **Claimant, Counter-Respondent** | ) | |
| | ) | |
| **v.** | ) | **Case No. 06-01261** |
| | ) | |
| **DENISE KAPPEL,** | ) | |
| | ) | |
| **Respondent, Counter-Claimant.** | ) | |

**AMENDMENT TO COUNTERCLAIM**

Respondent and Counter-Claimant, Denise Kappel, by and through her undersigned

attorneys, for her Amendment to her Counterclaim against Advanced Equities, Inc. ("AEI"),

states as follows:

**Breach of Contract**

1.      On September 15, 2005, Denise signed an Employment Agreement (Exhibit "A"

hereto) and an Agreement Regarding Trade Secrets, Confidential Information and Non-

Solicitation Agreement ("Trade Secret Agreement") with Advanced Equities, Inc. ("AEI")

(Exhibit "B" hereto).

2.      The Employment Agreement states in pertinent part:

This offer letter, together with the Trade Secrets, Confidential Information and
Non-Solicitation constitutes *the entire agreement between the parties*.

Emphasis supplied.

3.      The Trade Secret Agreement states in pertinent part:

**<u>INTEGRATION CLAUSE</u>**
This written agreement supersedes any prior written or verbal agreements
pertaining to your employment with the Firm, and is intended to be a *final
expression* of our Agreement with respect to the terms contained herein.

Bold and underline in original (emphasis supplied).

4.    The salient compensation terms of the Employment Agreement states as follows:

For the first fourteen months of your employment, you will receive a payout of sixty (60%) of the *gross fees and commissions* generated by you through Advanced Equities on all *business* except Private Equity. You will receive a fifty-percent payout on Private equity *business*. The minimum trade that will be paid a commission is seventy-five ($75) dollars.

After the fourteenth month of employment, you will receive a fifty percent (50%) payout of the *gross* fees and commissions on *all business including Private Equity business*.

Emphasis supplied.

5.    The clear and unequivocal language of the Employment Agreement provides that Denise was entitled to 50% of the *gross* fees and commissions generated by her $4.1 sale of the direct Infinera private equity investment in October and November of 2005.

6.    Any subsequent attempt to change this calculation of compensation must be mutually agreed upon *by both the employer and employee*. Finazzo v. Mid-States Finance Company, 63 Ill. App. 2d 161, 174 (1965) (The method of determining net compensation cannot be changed unilaterally by an employer).

7.    No subsequent agreement to reduce Denise's compensation from 50% of the fees and commissions on Private Equity business to 30% of said business was ever entered into by Denise and AEI.

8.    Any attempt by AEI to subsequently materially alter the compensation as stated in the Employment Agreement or to impose additional conditions on the eligibility to collect such compensation is unenforceable. Doyle v. Holy Cross Hospital, 186 Ill.2d 104, 111-12 (1999) (Any material unilateral change in employment compensation or benefits must be supported by a detriment *to the employer* for sufficient consideration to exist to enforce such change).

9.    AEI admitted that even if Denise had been made *subsequently* aware of this secret

condition: a) Denise received no benefit in exchange for such a unilateral imposition; and b) AEI suffered no corresponding detriment regarding this "change." Therefore, as stated in <u>Doyle</u>, *supra*, such unilateral attempts to alter the terms of Denise's employment fail for lack of consideration.

10.    Furthermore, as admitted by Dwight Badger ("Badger") a principle of AEI, the private placement for which Denise was to raise funds concerned "late stage" financing which would precede a "liquidity event" by six to eighteen months.

11.    Therefore, even after Denise did all she was required to do ( *i.e.* have her customers deposit funds with AEI and sign subscription agreements), the secret provision required a subsequent closing of the transaction (*i.e.* the customer funds being sent to Infinera followed by a subsequent "liquidity event" a minimum of six months *later* which, in turn, was to be followed by a *minimum* of six months of *additional* continuous employment which might possibly be extended to a year of continuous employment after the liquidity event).

12.    Since Denise could not possibly perform the unwritten continuous employment "condition" within a year, that secret, unwritten condition would also be unenforceable under the Statute of Frauds.

13.    The *gross* fees and commissions received by AEI for the direct investments in Infinera by Denise's customers  consisted of a 5% upfront fee and a back-end fee consisting of the distribution of warrants equal to 5% of the stock received by the customer.

14.    The upfront fees received by AEI from Infinera on the private equity investment made by Denise's clients totaled $205,000 (5% of $4.1 million). Denise was entitled, pursuant to the terms of her Employment Agreement, to 50% of that $205,000 or $121,500.

15.    The purchase price of Infinera stock to Denise's customers, and the price of the

warrants issued to AEI, was $5.40 which divided into $4.1 million equals 759,260 shares and 5% of that amount equals 37,962 warrants.

16.    Denise received approximately 30% of the up-front commissions and fees and has not received any warrants or stock.

17.    As stated by the Seventh Circuit:

Once an employee has earned wages by having *done the work that under his explicit or implicit employment contract* entitles him to those wages, *he has a vested right to them.* Colosi v. Electri-Flex Co., 965 F.2d 500, 504 (7th Cir.1992); In re Northwest Engineering Co., 863 F.2d 1313, 1316 (7th Cir.1988); National Metalcrafters v. McNeil, 784 F.2d 817, 820, 823 (7th Cir.1986); Illinois Wage Payment and Collection Act, 820 ILCS 115.

Harrell v. United States, 13 F.3d 232, 234 (7th Cir.1993).

18.    Denise is therefore owed at least $61,500 and 18,981 shares (50% of 37,962) of Infinera common stock as a result of her customers' direct investment of $4.1 million in Infinera in 2005.

### Fraud

19.    AEI presented Denise with a *form* Employment Agreement which AEI represented was the "entire agreement" of the parties. However, undisclosed to Denise, AEI had a policy of requiring an employee to be continuously employed by AEI from the sale of the private equity investment until 180 to 360 days after a "liquidity event" (*i.e.* a public offering) (the "liquidity event requirement") to receive her back-end compensation.

20.    The liquidity event requirement was not reduced to writing and was not disclosed to Denise either before she accepted a position with AEI or before she made the aforementioned $4.1 million sale related to Infinera.

21.    Asher Wolmark ("Wolmark"), the AEI branch manager, and Jeff Fisher ("Fisher"), AEI's president, recruited Denise.

22.     Fisher was aware of AEI's intent to enforce the liquidity event requirement and Wolmark at least knew that AEI claimed that it had such a verbal policy.  However, neither Wolmark nor Fisher disclosed this information to Denise either during her recruitment process or prior to her sale of the aforementioned Infinera investment.

23      AEI's silence on the liquidity event requirement constituted a material omission of fact.

24.     AEI's representation that the Employment Agreement was the "entire agreement" and, as stated in the integrated Trade Secret Agreement, "the final expression of our Agreement" was patently false.

25.     AEI intended that Denise rely on these knowing misrepresentations and omissions of material facts.

26.     Denise did, in fact, reasonably rely to her detriment on these knowing misrepresentations and omissions of material facts.

**Unjust Enrichment**

27.    After the initial sale of $4.1 million of the Infinera private equity investment to her customers, Denise attempted to make an additional sale to these customers. Denise was prevented from consummating this additional sale due to the hostile work environment purposefully created by AEI.

28.    Within a few weeks of Denise's resignation her customer invested $1 million in an additional purchase of the Infinera private equity investment.

29.    Since Denise was the procuring source of the additional $1 million investment in Infinera and was unable to consummate the sale solely as a result of AEI's wrongful actions, AEI was unjustly enriched.

**Damages**

30.    The warrants issued by Infinera were immediately exerciserable by AEI (11,838,900 shares traded on June 7, 2005).

31.    Infinera traded between June 7, 2005 and June 28, 2005 as follows:

| Date | High | Low | Close |
|------|------|-----|-------|
| 06/07/07 | 21.24 | 16.00 | 19.71 |
| 06/08/07 | 26.41 | 21.39 | 25.16 |
| 06/11/07 | 27.90 | 24.64 | 24.96 |
| 06/12/07 | 25.85 | 23.88 | 24.06 |
| 06/13/07 | 24.98 | 23.51 | 23.94 |
| 06/14/07 | 24.72 | 23.62 | 24.05 |
| 06/15/07 | 27.45 | 23.76 | 27.05 |
| 06/18/07 | 30.00 | 26.27 | 26.60 |
| 06/19/07 | 26.95 | 24.20 | 24.61 |
| 06/20/07 | 25.19 | 23.50 | 23.97 |
| 06/21/07 | 24.45 | 23.08 | 24.04 |
| 06/22/07 | 24.48 | 23.50 | 24.41 |
| 06/25/07 | 24.85 | 23.72 | 23.75 |
| 06/26/07 | 24.20 | 23.27 | 23.74 |
| 06/27/07 | 24.42 | 23.53 | 23.90 |
| 06/28/07 | 26.85 | 23.50 | 26.74 |

32.    Had Denise been vested with the warrants pursuant to her Employment Agreement either by AEI's directly exercising the warrants in her name or by a journal entry on its books, Denise would have been able to implement risk management measures which would have secured her a price of at least $24 per share.

33.    Therefore, the 18,981 shares of Infinera resulting from the warrants owed Denise would have generated $455,544 to her.

34.    The 4,630 shares of Infinera ($1 million divided by $5.40 x 5% x 50%) on the subsequent $1 million sale which unjustly enriched AEI would have generated 4,630 shares of Infinera or $111,120 to Denise.

35.    Additionally, Denise is owed $61,500 for the front-end payout on the original sale of $4.1 million and $25,000 on the subsequent $1 million sale.

36.    Therefore, Denis is entitled to the following damages:

A.  $515,544 for breach of contract ($455,544 warrant value plus $61,500 due on the front-end fees;
B.  $172,620 on her unjust enrichment claim;
C.  Fraud damages of $688,164 (the front-end and back-end fees generated by both the initial $4.1 million sale and the subsequent $1 million sale); and
D.  Punitive damages not to exceed three times the total compensatory damages.

Respectfully submitted,

_____
One of Respondent's Attorneys

Nicholas P. Iavarone, Esq.
The Iavarone Law Firm
209 S. LaSalle Street, Suite 701
Chicago, Illinois 60604
(312) 239-8830
(866) 554-8350 (fax)

Alan F. Block, Esq
Block & Landsman
11 S. LaSalle Street, Suite 1600
Chicago, Illinois 60603
(312) 251-1144
(312) 1147 (fax)