IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| DENISE KAPPEL, ) | |
| ) | |
| Movant, ) | |
| ) | Case No. 08 CV 1991 |
| v. ) | |
| ) | |
| ADVANCED EQUITIES, INC, ) | |
| ) | |
| Respondent. ) | |

**MOVANT'S REPLY TO RESPONDENT'S RESPONSE TO MOTION
FOR SANCTIONS PURSUANT TO 28 U.S.C. § 1927**

NOW COMES Movant, Denise Kappel, by and through her undersigned attorney, and for her reply to Respondent's Response to Motion for Sanctions Pursuant to 28 U.S.C. § 1927, states as follows:

The filings of Respondent in this matter are, at best, troubling. The Movant was required to arbitrate and now having prevailed, the Respondent now seeks to avoid the Award through argument and tactics that require, at a minimum, the imposition of sanctions pursuant to 28 U.S.C. § 1927.

**The Testimony In The Record**

As noted in Movants underlying Motion for Sanctions, Respondent ignored the following testimony from Dwight Badger:

```
23      Q   Who drafted this?
24      A   I don't know who drafted it.
 1      Q   What -- well, you read it.
 2      A   I don't know who drafted it.  Look, I
 3      got an organization where I've got 400 --
 4      roughly --
 5      Q   You have a record --
 6      A   -- 300 plus employees.
```

P. 207-08 (emphasis supplied).[1] Mr. Badger above-quoted answers were elicited during questioning concerning Movant's employment agreement *with Respondent*.

Mr. Daubenspeck testified on February 25, 2008 for which not one but two of Respondent's in-house counsel were present together with the two trial counsel. Not once did Respondent's counsel make any attempt to clarify any of Mr. Daubenspeck's testimony just as they had not attempted to clarify Mr. Badger's testimony on the issue of the number of employees. As Respondent *admits* in its Response, Mr. Daubenspect testified that he was the "executive chairman" of *Respondent*. Response at p.4.[2] Mr. Badger is a founder of *Respondent*:

```
5        Q    Let's just take the period -- well,
6       when was Advanced Equities up and running?
7        A    We started in business in August of
8       '99.
```

September 11, 2007 transcript at p. 4. As previously noted, Respondent unapologetically omitted the following testimony of Mr. Daubenspeck on Side A of Tape 1 of his February 25, 2008 testimony from it Opposition and supporting Memorandum of Law:

---

[1] Mr. Daubenspeck testified *only* on February 25, 2008. If the two trial counsel representing Respondent did not communicate that fact to counsel for Respondent in this proceeding, not one but *two* of Respondent's in-house counsel were also present for Mr. Daubenspeck's testimony. The first transcript provided to Movant by Respondent *starts in mid-sentence*:
```
1  BEGINNING OF TAPE 1, SIDE A:
2
3  BY MR. IAVARONE:
4    Q.  -- both of them.
5    A.  Yep.
6    Q.  I have stock that my clients own.
7    A.  Correct.
```
Why the testimony is "missing" from the tapes Respondent obtained from FINRA but is a troubling question. And, why Respondent did not contact FINRA to determine if there was a technical malfunction in copy Tape 1 is an open question. What is not open to question is that Respondent's current attorneys who were *not* present at the Arbitration Hearing filed an Opposition without knowing the status of the record (since Tape 1 was missing an entire side) and affirmatively state without a good faith factual basis that "*Nowhere in the record,* however, is there evidence to support the allegation that AEI had between 200-300 employees." Memorandum of Law at p. 4.

[2] Both Mr. Daubenspeck and Mr. Badger have been registered *solely* with Respondent since 1999.

2

| | | |
|---|---|---|
| Q. | How many employees do you have? | |
| A. | Several hundred. | |
| Q. | Can you give us a number? | |
| A. | I. . .I don't know. We have a big company . . . a big organization. | |
| Q. | More than 500? | |
| A. | . . . employees, I don't know if it's more than 500, *I think it is 200 or 300.* | |

Emphasis supplied. Mr. Badger, for example, testified:

```
1            I would -- I would highly doubt
2       that Ms. Kappel made her decision to join our firm
3       based on the back end or a warrant because she had
4       never been a broker anywhere else and had never
5       received a back end or a warrant anywhere else in
6       her employment.
```

September 11, 2007 transcript p. 42. (emphasis supplied). The "our firm" that Movant joined was Respondent, not Advanced Equities Financial Corp. ("AEFC").

Now Respondent contends that when Messrs. Daubenspeck and Badger gave the above-quoted testimony at the Arbitration Hearing, they were not referring to Respondent with whom they were registered and of whom Mr. Daubenspeck was "execute chairman" but to another entity, AEFC who was a stranger to Movant's employment agreement. Assuming, arguendo, there was a confusion as to entities, that *Respondentsn ever made that argument to the Arbitration Panel*. It is entirely improper for Respondent to now argue that the Arbitrators misinterpreted their testimony, or that it had a different meaning.

> [Respondent] clearly should have made further efforts at the time of the Arbitration Proceedings to conduct its investigation. As indicated above, the role of a court reviewing an arbitrator's award is extremely limited and a court can only overturn an award based upon evidence "not discoverable upon the exercise of due diligence prior to the arbitration."

3

Nilssen v. Magnetek, Inc., 2008 U.S. Dist. LEXIS 31286, *8 (N.D. Ill. 2008) (internal citation omitted).[3]

For whatever reason, Respondent's numerous counsels chose not to present or clarify such testimony to the Arbitration Panel. Assuming, *arguendo*, the testimony was unclear to the Arbitrators, it was the Respondent's burden to clarify the testimony. The time for Respondent to present and argue evidence was at the hearing, not after the record has been closed and the matter is up for confirmation.[4] To attempt to do so now is a frivolous attempt to multiply the proceedings.

### Respondent *Never* Corrected Or Clarified The Record It Now For The First Time Claims Is Wrong.

As noted above, despite having an abundance of counsel at its table, Respondent failed to introduce any convincing testimony or other evidence regarding the number of employees.[5] Notwithstanding Movant's purported lack of evidence, Respondent's legion of attorneys also failed to object to the arguments made during the closing arguments.

Tape 6 contains the undersigned's closing argument.[6] Inexplicitly missing from

---

[3] Though Nilssen addressed the request to overturn an arbitral award, the standard is the same for an attempt to modify an award.

[4] As discussed below, any suggestion (*see, e.g.*, fn. 1 to Response) that Movant did not prove an element of her claim or that Respondent had no opportunity to contradict Movant's submissions to the Arbitration Panel is baseless. In reality, Respondent was given numerous opportunities to make direct and rebuttal arguments, submit its own demonstrative evidence (which it did), and object to any submission to the Panel.

[5] Respondent now tries to argue that the evidence was that there was only "70 brokers at Advanced Equities". (Response, p. 6). Again, Respondent is impermissibly trying to argue evidence. Not only is it too late for this argument, unfortunately for Respondent, Title VII looks at the total number of employees -- not merely the number of brokers.

[6] Page 208, of Respondent's second volume of transcript states:
　　　　1　　　(BEGINNING OF AUDIOTAPE NO. 6)
Page 229, the transcript states:
　　　　14　　　CLOSING ARGUMENT BY MR. IAVARONE
At page 246 of the transcript, the undersigned attorney is continuing with his closing argument *as Tape 6*

4

the transcript of Tape 6 generated by Respondent is the following argument by the undersigned counsel from Side B of Tape 6:

> Both Mr. Badger and Mr. Daubenspeck talked about *the firm* having between 200 and 300 employees. Under the Title VII, you know, you're limited based on the number of employees. The total she can get for a hostile work environment of both – and that's why in the award it has to be clear and I know it will be, what is awarded for what claim – because in this claim it *is* $200,000 total of compensation (sic) – that the most she can get and that includes punitive damages by statute. Can't get more than that.

Side B of *Tape 6*.[7] Not only was there *no* objection to this re-statement of the evidence by undersigned counsel, but Respondent's counsel had the opportunity to engage in a *rebuttal* argument which occupies Tape 7. Not *once* during the entire rebuttal argument did Respondent's counsel *ever* take issue with the statement by undersigned counsel that the evidence proved that the Respondent had 200-300 employees. Therefore, clearly, no ambiguity existed at the Arbitration Hearing concerning the number of Respondent's employees.

### The Award of Damages For Breach Of The Employment Agreement Is Supported By The Record

Equally baseless is the Respondent's continued attempts to argue about the calculation of damages. As Movant stated in her Motion for Sanctions, she was seeking additional warrants and cash. At hearing Movant one of the theories presented was that if

---

*ends*:
    4  Mr. Fisher testified to these matters, and then we
    5  moved to amend for fraud.
    6      (END OF AUDIOTAPE NO. 6)
The third volume of Respondent's transcript begins as Respondent's counsel begins his rebuttal argument:
    1  (Beginning of Tape No. 7, Side A.)
        . . . .
    10  CLOSING ARGUMENT ON BEHALF OF ADVANCED EQUITIES
    11  MR. MUNRO: I had a law professor once that

[7] The odds that Tape 1 provided to Respondent by FINRA is missing Mr. Daubenspeck's crucial testimony *and* that Tape 6 would serendipitously be missing *the* portion of the closing argument on the very issue being contested by Respondent are *astronomical*.

5

she had been provided the warrants as her employment agreement required, she could have converted the warrants to common stock when Infinera went public in June 2007 and then locked in a price of at least $24 a share. The record supports that share price. Respondent is not permitted, pursuant the clear precedent Movant previously cited, from arguing its rejected damage theory on a motion to confirm.

Not surprisingly, the undersigned's argument on this issue (which is contained on Side B of Tape 6) is *also missing* from Respondent's transcript. In that portion of the argument, the undersigned recounted movant's testimony that if she had been provided the warrants pursuant to her employment agreement she could have immediately exercised the warrants and engaged in protective strategies that would have guaranteed her a price during the lock-up period referenced by Respondent. During this untranscribed portion of the undersigned's argument on Side B of Tape 6 the Panel Chairman specifically queried the undersigned on how the damages could be calculated pursuant to Movant's theory based on an average price during this June-July 2007 period.[8]

Both sides argued their theory of damages. Respondent is not permitted by the clear precedent Movant previously cited from arguing its damage theory on a motion to confirm in the guise of a computational error. It is clearly sanctionable for the Respondent to multiply these proceedings by rearguing that rejected theory now.

---

[8] We simply do not know if the award was entirely for the lost warrants or if it contains a component for underpaid commissions. The Panel could have adopted the $260,328 figure - - or any other number - - as a matter of short hand convenience as an omnibus award for all of Respondent's defalcations. In the absence of a *formula or details* from the Panel, it is pure speculation to assume what motivated the Panel to award that amount. As the Second Circuit has stated:
> Section 11 [of the FAA] which is limited to matters of form not affecting the merits of the controversy, does not license the district court to substitute its judgment for that of the arbitrators. . . . This sort of judicial intervention into the arbitral process is precisely what the narrowly defined provisions of sections 10 and 11 were designed to prevent.

Diapulse Corporation of America v. Carba, Ltd., 626 F.2d 1108, 1110 (2nd Cir. 1980).

6

## Conclusion

. Respondent has unreasonably and vexatiously multiplied these proceedings in violation of 28 U.S.C. § 1927 and Movant is entitled to an award of reasonable attorney's fees.

Respectfully submitted,

_____
One of Movant's attorney's

Nicholas P. Iavarone, Esq.
The Iavarone Law Firm
11 S. LaSalle Street, Suite 1600
Chicago, Illinois 60603
(312) 637-9466
(800) 417-0580 (fax)

Alan F. Block, Esq.
Block & Landsman
11 S. LaSalle Street, Suite 1600
Chicago, Illinois 60603
(312) 251-1144
(312) 251-1147 (fax)

May 14, 2008

## CERTIFICATE OF SERVICE

Nicholas P. Iavarone, an attorney licensed to practice law in the State of Illinois, states that before 2:00 p. m. on Wednesday, May 14, 2008 he caused Movant's Reply to Respondent's Response to Motion For Sanctions Pursuant to 28 U.S.C. § 1927 to be served via email and facsimile to the undersigned counsel:

James D. Wilson, Esq.
Shefsky & Frolich
111 E. Wacker Drive, #2800
Chicago, Illinois 60601

_____
One of Respondent's Attorneys

Nicholas P. Iavarone, Esq.
The Iavarone Law Firm. P.C.
11 S. LaSalle Street, Suite 1600
Chicago, Illinois 60604
(312) 637-9466
(800) 417-0580 (fax)